NOT FOR PUBLICATION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____

                                         :
ERIK T. FELL,                            :
                                         :        Civil No. 17-0350 (RBK)
                              Plaintiff, :
                                         :        **OPINION**
                                         :
                    v.                   :
                                         :
NANCY A. BERRYHILL,                      :
Acting Commission of Social Security,    :
                                         :
                             Defendant.  :
_____          :

**KUGLER**, United States District Judge:

This matter comes before the Court upon the appeal of Erik T. Fell ("Plaintiff") for review of the final determination of Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner"). The Commissioner denied Fell's application for Social Security Income ("SSI") benefits. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED**.

I.      **BACKGROUND**

Plaintiff seeks judicial review of the Commissioner's final administrative decision denying his claim for SSI. (Pl. Br. at 1); 42 U.S.C. § 405(g). Plaintiff asserts that the Commissioner's decision is not based on substantial evidence, and that she erred as a matter of law in evaluating the case. (Pl. Br. at 1).

Plaintiff was born on June 26, 1987 and graduated high school with special education services. (Pl. Br. at 2). He completed a two-year certificate program in cosmetology in 2011, and

worked as a sales associate in the past. (Def. Opp. at 2; Tr. 63, 302-03, 413). In terms of daily living, Plaintiff shopped by himself and walked from the grocery store regularly carrying 30-50 pounds of groceries, used public transit, cooked multi-course meals, baked, performed chores, cared for his personal needs, played videogames, used the computer, sewed, gardened, and watched television. (Tr. 67-68, 70, 316-20, 334-40, 413; Def. Opp. at 2).

Medical History

Plaintiff has a long medical history. This history will be addressed doctor-by-doctor, beginning with the doctors who evaluated him after the traumatic brain injury ("TBI") that occurred when he was struck by a vehicle in August 1996 (Pl. Br. at 2). Prior to the accident, Plaintiff had been classified as "Perceptually Impaired" and diagnosed with attention deficit disorder. (*Id.*). He had also been described as inattentive, immature, and very distractible. (*Id.* at 3).

*Cynthia Peterson, Ph.D., and Bradford Ross, Ph.D.*

Dr. Peterson and Dr. Ross evaluated Plaintiff in November 1996, when he was nine years old, to evaluate the TBI (Pl. Br. at 2). He was hospitalized for the TBI with a right choroid nucleus hemorrhage and a right frontal lobe parenchymal hemorrhage. (*Id.*). After the accident, Plaintiff—who was otherwise right-hand dominant—had to rely on his left-hand. (*Id.* at 3.). The doctors noted deficits in Plaintiff's verbal comprehension, visual perceptual abilities, impaired manual dexterity and grip strength bilaterally/fine motor difficulties, graphomotor weaknesses, attention and concentration, and variably impaired memory. (*Id.*). He had issues with distractibility and attention problems. (Pl. Br. at 3). The doctors concluded that his deficits and capacities could continue to change over time. (*Id.*).

Dr. Ross reevaluated Plaintiff in February 1999. (Pl. Br. at 3). His visual perceptual abilities increased and his memory improved. (*Id.*). His other issues were nevertheless present, and Dr. Ross opined that while "the most rapid gains [in recovering from TBI] have likely occurred . . . residual areas of weakness will remain." (*Id.*).

*Myron Sewell, M.D. and Mignon D'Guerra, M.D.*

Drs. Sewell and D'Guerra treated Plaintiff for the residual effects of his TBI between October 2011 and April 2015. (Pl. Br. at 3). At the initial appointment on October 12, 2011, Plaintiff reported headaches with difficulty focusing and concentrating after his accident. (*Id.* at 3-4). Dr. Sewell assessed a headache, stroke syndrome without residual deficits, and generalized anxiety disorder. (*Id.* at 4). He prescribed Plaintiff Vistaril three times daily. (*Id.*). In January 2012, Plaintiff reported that the Vistaril caused drowsiness, but his "anxiety [was] much better." (Pl. Br. at 4). Plaintiff reported similarly in May 2012, but noted left knee swelling. (*Id.*).

In July 2012, Plaintiff reported a panic attack, depression, and anxiousness, and requested a referral to a psychiatrist. (*Id.*). Dr. Sewell assessed mild single episode major depression and generalized anxiety disorder, and referred Plaintiff to a psychiatrist. (*Id.*). The referral was not taking new patients, and on August 6, 2012, Dr. Sewell prescribed Vistaril again. (Pl. Br. at 4).

On August 30, 2012, Dr. Sewell noted motor dysfunction and reduced strength of the left upper and lower extremities, but the rest of the diagnosis was unchanged. (*Id.*). He filled out a Residual Functional Capacity ("RFC") questionnaire and noted issues with memory, concentration, and left side weakness that would "constantly" interfere with attention and concentration. (*Id.*). He stated that Plaintiff could walk for more than eight blocks, sit eight hours per day, and stand or walk for four hours per day for 30 minutes per instance. (*Id.*). He could lift up to 20 pounds frequently and 50 pounds occasionally, but was limited to 50% capacity in his

left upper extremity. (Pl. Br. at 4). Dr. Sewell predicted absences twice a month from work. (*Id.*). Dr. Sewell stated these limitations had applied since 1996. (*Id.*). In a Mental Capacity Assessment ("MCA") also completed on August 30, 2012, Dr. Sewell stated Plaintiff would have "marked" limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.* at 5).

On September 14, 2012, Dr. Sewell continued Plaintiff's Vistaril prescription as the diagnoses remained the same. (*Id.*). On December 19, 2012, Dr. Sewell treated Plaintiff for ongoing anxiety, depression, and neck pain. (*Id.*). On February 27, 2013, Plaintiff reported anxiety, weight gain due to Vistaril, and bilateral knee pain. (*Id.*). Dr. Sewell discontinued Vistaril and prescribed BuSpar and promethazine, with naproxen for knee pain. (Pl. Br. at 5).

On May 15, 2013, Dr. Sewell noted motor dysfunction with reduced strength of the upper extremities. (*Id.*). He completed a second RFC questionnaire and noted that Plaintiff was "not going to improve,"—he also noted confusion, poor hand eye coordination, headaches, and muscle atrophy. (*Id.*). Dr. Sewell said that Plaintiff could walk four blocks at a time, sit four hours total for 30 minutes at a time, and stand/walk two hours total for 30 minutes at a time. (*Id.*). He could still lift 20 pounds frequently and 50 pounds occasionally. (Pl. Br. at 5). Plaintiff was limited to 50% bilateral use of his hands, and absences three to four times per month from work. (*Id.*). Dr. Sewell said Plaintiff was physically incapable of a 40 hour workweek. (*Id.*).

On September 18, 2013, Plaintiff informed Dr. Sewell that his therapist suggested he was bipolar, and Dr. Sewell prescribed lithium 300 mg. (*Id.*). Dr. Sewell also noted muscle spasms in Plaintiff's lower back. (Pl. Br. at 5-6).

On November 13, 2013, Plaintiff reported he was less anxious since starting lithium and that he had discontinued BuSpar. (*Id.* at 6). On January 9, 2014, Plaintiff reported feeling better

since starting lithium but still had knee pain, and was prescribed naproxen for the knee pain. (*Id.*).

On March 5, 2014, Plaintiff saw Dr. Sewell, reported forgetfulness, trouble forming sentences, and anger. (*Id.*). Dr. Sewell completed a third RFC, which was consistent with the May 2013 RPC. (*Id.*).

On July 28, 2014, Plaintiff saw Dr. D'Guerra for his headache—Dr. D'Guerra noted a subtherapeutic lithium level, and lithium was doubled to 600 mg daily. (Pl. Br. at 6).

On October 8, 2014, Plaintiff visited Dr. D'Guerra again and complained of a headache, loss of balance, and slightly blurry vision on the increased lithium dosage, which his psychiatrist recommended he change to Latuda. (*Id.*). Plaintiff stated that he did not want to see the psychiatrist any longer because he could not understand her accent. (*Id.*). Dr. D'Guerra decreased the lithium dosage, but noted the lithium level was therapeutic at the higher dosage. (*Id.*).

On November 28, 2014, Dr. D'Guerra noted that Plaintiff's anxiety was uncontrolled at the lower lithium dosage, his insurance would not cover Latuda, and he had gained a significant amount of weight on Vistaril. (*Id.*). Lithium and Vistaril were prescribed. (Pl. Br. at 6).

On March 18, 2015, Dr. D'Guerra noted therapeutic lithium levels at 300 mg twice daily (600 mg per day), and that Plaintiff's anxiety was controlled on Vistaril. (*Id.*).

On April 1, 2015, Dr. D'Guerra noted that Plaintiff's lithium level was again low but his mood was stable. (*Id.*). Plaintiff had muscle spasms in his back and he could not take naproxen with lithium. (Pl. Br. at 6-7). Plaintiff also needed to see a new therapist—his last one discharged him due to bed bugs. (*Id.* at 7).

*It Takes A Family*

Plaintiff underwent a comprehensive clinical assessment at It Takes A Family ("ITAF") on August 14, 2012. Plaintiff reported panic attacks once or twice daily despite his Vistaril use. (*Id.*). Plaintiff also noted depression, bizarre behavior, difficulty in social settings, and anxiousness. (*Id.*). ITAF observers noted Plaintiff was suspicious, had poor eye contact, slow and soft speech, was in an anxious mood, and other problematic behavior. (Pl. Br. at 7). His judgment was poor, insight was moderate, and was scheduled for counseling starting May 2013. (*Id.*).

*Access Mental Health*

Plaintiff received treatment at Access Mental Health ("AMH") from November 11, 2013 through September 30, 2014, and on March 16, 2015. (*Id.*). On September 30, 2014, Plaintiff was discharged from AMH because Plaintiff refused to have the advanced practice nurse prescribe him medication. (*Id.*). Plaintiff was rude, and reported feeling "okay at times and not okay at times" while on lithium 600mg as prescribed by Dr. D'Guerra. (Pl. Br. at 7).

On March 16, 2015, Plaintiff stated that he returned to AMH because ITAF no longer accepted his insurance and stopped attending a different treatment center because of bedbugs. (*Id.*). He wanted to stop lithium. (*Id.*). He was irritable and guarded but displayed fair judgment and poor insight. (*Id.* at 8). He was diagnosed with Bipolar I disorder; social phobia; post-traumatic stress disorder ("PTSD"); and a Global Assessment of Function ("GAF") score of 60. (Pl. Br. at 8).

Plaintiff returned on July 23, 2015. (*Id.*). Plaintiff was prescribed lithium 300 mg, Latuda, and Vistaril, but could not afford Latuda. (*Id.*). Plaintiff reported impulse control issues, mood swings, and anger problems. (*Id.*). Plaintiff had a constricted affect, was both cooperative and

uncooperative during the evaluation, had an anxious and depressed mood, was withdrawn and guarded, and had irregular concentration. (Pl. Br. at 8). He was diagnosed with Bipolar I disorder; social phobia; generalized anxiety disorder; PTSD; impulse control disorder NOD; and a GAF of 55. (*Id.*). Medications were continued and samples of Latuda were provided. (*Id.*).

*Hampton Behavioral Health and Christabelle D'Souza, M.D.*

Plaintiff received intensive outpatient treatment at Hampton Behavioral Health four days per week from February 24 through March 3, 2015, and continued treatment at "AAMH"[1] through May 26, 2015. (*Id.*). Plaintiff enrolled in this program because of his depression, anxiety, and mood swings. (Pl. Br. at 8). At discharge, Plaintiff was prescribed lithium 300 mg and diagnosed with an unspecified mood disorder and PTSD. (*Id.*). Don Wijaya, M.D., diagnosed Plaintiff with mood disorder NOS, TMI, and PTSD. (*Id.*).When discharged, Dr. D'Souza diagnosed Plaintiff with depression, bipolar disorder, and obsessive compulsive disorder ("OCD") (*Id.* at 9).

On March 13, 2013, Dr. D'Souza completed a MCA. (Pl. Br. at 9). Dr. D'Souza opined that Plaintiff had extreme impairments in his ability to: (1) perform activities on schedule and maintain regular attendance and punctuality; and (2) maintain socially appropriate behavior and cleanliness. (*Id.*). She further opined that Plaintiff demonstrated marked impairment in his ability to: (1) understand and remember detailed instructions; (2) carry out short and simple instructions; (3) sustain an ordinary routine without supervision; (4) ask simple questions or request assistance; (5) understand and properly prepare for hazards; (6) travel in unfamiliar places or use public transit; and (7) set goals or make plans. (*Id.*). Dr. D'Souza also noted limitations due to TBI, mood swings, OCD, and limited social interactions. (*Id.*).

---

[1] AAMH appears to be another treatment facility.

*Magy Dawoud, M.D.*

Dr. Dawoud examined Plaintiff on February 25, 2011 pursuant to the Commissioner's request. (Pl. Br. at 9). Plaintiff reported multiple mental and cognitive impairments. (*Id.*). Dr. Dawoud observed that Plaintiff had a "blunted affect" and "difficulty with intermediate and short-term memory and sometimes repeats things." (*Id.*). Upon examination, Plaintiff had a mildly-deviated left eye medially on range of motion, mild scoliosis of the back, crepitus of the left knee, difficulty with balance on the left leg, and diminished range of motion of the left ankle, but full strength in all of his extremities. (*Id.* at 10). Dr. Dawouud noted no physical limitations, but "the main issue . . . is with memory loss and possible cognitive dysfunction." (Pl. Br. at 10.)

*Robert Waters, Ph.D.*

On February 28, 2011, Dr. Waters evaluated Plaintiff at Commissioner's request. (*Id.*). Plaintiff was not taking medication or receiving psychiatric or psychological services or assistance at the time. (*Id.*). Plaintiff reported being unable to work due primarily to memory problems, but also reported anxiety issues. (*Id.*). He also reported mild depressive symptoms. (Pl. Br. at 10).

Dr. Waters's examination noted some anxiety and episodic stuttering due to Plaintiff's TBI. (*Id.*). Dr. Waters concluded Plaintiff's attention was "adequate," test judgment was "deficient," and his recent memory was "mildly deficient." (*Id.*). But Dr. Waters noted that Plaintiff's concentration was intact, he performed serial 3's without difficulty, he could repeat six digits forward and five digits backwards, he correctly performed mathematical calculations ($8 \times 5 = 40$ and $12 \times 6 = 72$), his remote and immediate memories were intact, he performed two-step directions, his abstract reasoning was good, his social judgment was sound, he displayed a wide range of knowledge, and he had average to above average intellectual abilities. (Tr. 413-14;

Def. Opp. at 3). Dr. Waters concluded that Plaintiff had "severe limitations due mainly to his mental status with his physical status playing a less significant role." (*Id.*). Dr. Waters diagnosed cognitive disorder NOS secondary to TBI, generalized social phobia, and depressive disorder NOS. (*Id.* at 11).

*George Knod, D.O.*

On January 8, 2012, Dr. Knod examined Plaintiff at the Commissioner's request. (Pl. Br. at 11). At the time, Plaintiff took Vistaril 25 mg three times per day for anxiety and was seeing a psychiatrist. (*Id.*). Plaintiff reported occasional loss of focus in his left eye, difficulty with depth perception, knee pain, and balance problems. (*Id.*). Plaintiff also had mild flattening of the left nasolabial fold consistent with his TMI, deep tendon reflexes of 2/4 on the right side and 3/4 on the left, an equivocable left Babinski, and mild deficits in the fine motor skills in the left hand, but intact gross motor skills. (Pl. Br. at 11). Plaintiff did "present with prior level cognitive deficits with decreased insight [and] decreased higher level executive function," and a psychiatric evaluation was recommended due to his anxiety and depression. (*Id.*). Dr. Knod noted normal grip strength and that Plaintiff could ambulate without assistance on a level surface. (*Id.*). Dr. Knod suggested Plaintiff's higher level executive functions, though, may be limited. (*Id.*).

*Lewis Lazarus, Ph.D.*

Dr. Lazarus evaluated Plaintiff on December 20, 2012 at the Commissioner's request. (Pl. Br. at 12). At the time, Plaintiff was taking Vistaril and receiving counseling and therapy. (*Id.*). Dr. Lazarus observed no general anxiety symptoms, but episodes of panic and moments of elevated or expansive moods as well as memory and concentration issues. (*Id.*). Dr. Lazarus noted that "[o]verall, the examination results are considered to be consistent with the claimant's

allegations." (*Id.*). Dr. Lazarus recommended further cognitive functioning examination, psychiatric follow-up, and individual psychological counseling. (Pl. Br. at 12). Dr. Lazarus diagnosed cognitive disorder, NOS; learning disorder, NOS; panic disorder without agoraphobia; and a GAF score of 55. (*Id.*).

*William Dennis Coffey, Psy.D.*

On July 1, 2015, Dr. Coffey evaluated Plaintiff at the Administrative Law Judge's ("ALJ") request for an Intellectual Assessment and completed a Medical Source Statement of Ability To Do Work-Related Activities (Mental). (*Id.*). Plaintiff reported that he was not working because he moved a lot, nothing was available, and his physical limitations. (*Id.*). Plaintiff was an hour late to the examination after missing the bus. (Pl. Br. at 12). Plaintiff was awkward, and gave odd responses to questions of abstract reasoning. (*Id.*). Plaintiff also displayed very poor psychomotor processing. (*Id.* at 12-13).  Dr. Coffey opined that Plaintiff had a WAIS-IV Full Scale IQ of 90.[2] (*Id.* at 13). Subtests, however, indicated some processing speed deficiencies. (Pl. Br. at 13). Dr. Coffey diagnosed Plaintiff with Asperger's Disorder and Somatoform Disorder NOS, with recommendations to attend vocational rehabilitation services and psychotherapy. (*Id.*). Dr. Coffey opined that Plaintiff would have moderate impairment in understanding, remembering, and carrying out complex instructions; making judgments on complex work-related decisions; and interacting appropriately with co-workers. (*Id.*). Dr. Coffey stated that Plaintiff would have a "marked" impairment in his ability to respond appropriately to work pressures in a usual work setting. (*Id.*). Dr. Coffey expressed concern that Plaintiff would likely develop somatic symptoms in a work environment and display an inability to complete tasks in a timely manner. (Pl. Br. at 13).

---

[2] Plaintiff scored a 95 on a 1999 full-scale IQ test. (Tr. 504, 507).

*State Agency Assessments*

In March 2011, Joseph Wieliczko, Psy.D., opined that Plaintiff "has the ability to understand, remember, and follow simple instructions, make simple decisions, adapt, and perform routine work related activities." (*Id.*).

In January 2013, psychologist Sharon Flaherty opined that Plaintiff could perform simple tasks. (*Id.*).

In March 2013, Jyothsna Sahstry, M.D., opined Plaintiff could perform light exertional activity with occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, and forewent gross manipulation with the left upper extremity. (*Id.*).

In July 2013, Arvind Chopra, M.D., affirmed Dr. Shastry's opinion. (Pl. Br. at 13).

In August 2013, psychiatrist Thomas Yared, M.D., opined that Plaintiff "retains the ability to meet the basic mental demands of unskilled work." (*Id.*).

Procedural History

Plaintiff filed an application for SSI benefits on August 9, 2012. (Pl. Br. at 1). He claims that he has been disabled since January 1, 2002, due to traumatic brain injury, depression, memory loss, cognitive impairment, and joint pain. (*Id.*). His initial claim was denied. (*Id.*). Following this denial, he sought a hearing for his case. (*Id.*). This hearing was held before ALJ Jonathan L. Wesner on September 2, 2015. (*Id.*; Tr. 59-90, 103-33, 138-66). On October 29, 2015, ALJ Wesner ruled against Plaintiff. (Pl. Br. at 1). He found that Plaintiff suffers from non-listing severe impairments of post remote traumatic brain injury ("TBI"), moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no extended duration episodes of decompensation. (*Id.* at 1-2). ALJ Wesner determined that Plaintiff retains

the residual functional capacity ("RFC") to perform "light work as defined in 20 CFR

416.967(b)" with limitations consisting of:

> Occasionally climbing ramps and stairs; never climbing ladders, ropes, or
> scaffolds; occasional use of the dominant left hand; frequent use of the non-
> dominant right hand; and unskilled work dealing with things not people.

(Pl. Br. at 2; Tr. 32). A vocational expert ("VE") testified that jobs for people with such

restrictions exist in significant numbers in the national economy. (Tr. 79-89). ALJ Wesner stated

that while Plaintiff did not have relevant past work, he was not disabled because he could

perform work in the "representative occupation" of "bakery line conveyor with over 300,000

jobs available nationally." (Pl. Br. at 2; Tr. 39-40).

Plaintiff appealed to the Appeals Council—this appeal was denied on November 30,

2016. (Pl. Br. at 2). Thus ALJ Wesner's decision constitutes the Commissioner's final decision

for this Court's purposes.

## II.    STANDARD OF REVIEW

When reviewing the Commissioner's final decision, this Court is limited to determining

whether the decision was supported by substantial evidence after reviewing the administrative

record as a whole. *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing 42 U.S.C. §

405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000). The

often-used quotation for the standard is that substantial evidence is "more than a mere scintilla

but may be somewhat less than a preponderance of the evidence." *See, e.g., Rutherford v.

Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). Courts may not set aside the Commissioner's

decision if it is supported by substantial evidence, even if this court "would have decided the

factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001).

When reviewing a matter of this type, this Court must be wary of treating the determination of substantial evidence as a "self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). This Court must set aside the Commissioner's decision if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf v. Callahan*, 927 F. Supp. 277, 284–85 (D.N.J. 1997) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)). Evidence is not substantial if "it really constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114). A district court's review of a final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." *Kent*, 710 F.2d at 114.

III.    DISCUSSION

   A.  The ALJ's RFC Finding Is Supported By Substantial Evidence.

Plaintiff argues that the ALJ's RFC formulation is not supported by substantial evidence, and instead the result of improper reliance on certain parts of the record and the unsupported rejection of important treating source statements. (Pl. Br. at 14 ("Rather than weighing medical opinions of record . . . the ALJ came up with his own lay assessment")). To prove disability, an impairment must limit a claimant and preclude him or her from gainful employment. 42 U.S.C. § 1382c(a)(3)(A); *see Jones v. Sullivan*, 954 F.2d 125, 128-29 (3d Cir. 1991); *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990). The RFC assessment "is the most [a claimant] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a). The RFC assessment must resolve inconsistencies in the record. SSR 96-8p, 1996 WL 374184 (S.S.A. 1996). Plaintiff, though, maintains that the ALJ's "rationale does not meet [the appropriate] standards." (Pl. Br. at 14).

Plaintiff's argument is three-fold: (1) the ALJ improperly rejected portions of Dr. Coffey's opinion; (2) the ALJ erroneously rejected Dr. Sewell's and Dr. D'Souza's opinions regarding mental limitations; and (3) the ALJ erroneously rejected Dr. Sewell's opinions regarding manipulative limitations. (*See* Pl. Br. 14-19).

First, Plaintiff argues that the ALJ erred when he rejected portions of Dr. Coffey's opinion. The ALJ decided that Dr. Coffey's indications that Plaintiff would have marked limitations in responding to usual work pressures and would have problems completing tasks in a timely manner were inconsistent with the "normal functioning" Plaintiff otherwise demonstrated in his examination and elsewhere in the record. (Tr. 790-92).

Second, Plaintiff argues that the ALJ erroneously rejected Dr. Sewell's and Dr. D'Souza's opinions regarding mental limitations. The ALJ, however, explained that Dr. Sewell was Plaintiff's primary care physician and not a treating psychologist or psychiatrist. (Tr. 36). Dr. Sewell additionally relied solely on Plaintiff's complaints in his diagnoses. As such, the ALJ maintained that Dr. Sewell's opinion as to Plaintiff's mental functioning could be discounted. The ALJ similarly afforded little weight to Dr. D'Souza's opinion because Dr. D'Souza did not submit progress notes documenting clinical findings to support the alleged limitations, and because the opinion was inconsistent with other substantial evidence. (Tr. 33-39; 620-22; Pl. Br. at 18).

Third, Plaintiff argues that the ALJ erroneously rejected Dr. Sewell's opinions regarding manipulative limitations. The ALJ dismissed or discounted these opinions because he found that Plaintiff had "infrequent physical health complaints and treatment visits," a lack of "clinical or objective evidence" in support of the alleged limitations, and Dr. Sewell's "few observations of nonspecific reductions in left greater than right upper extremity strength" and how that conflicted

with Dr. Knod's "generally unremarkable upper extremity findings during the same period." (Tr. 34; Pl. Br. at 19).

The problem for Plaintiff, though, is that this Court cannot set aside the Commissioner's decision if the decision is supported by substantial evidence, even if this court "would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *See Barnhart*, 399 F.3d at 552. It is not this Court's responsibility to assume a fact-finding role—in fact, this Court is barred from doing so when reviewing an ALJ's decision. *Zirnsak*, 777 F.3d at 610. Furthermore, this Court's job in such a case is not to determine whether the factual determination was "right." Instead, we must decide whether there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales*, 225 F.3d at 316 (3d Cir. 2000). In this case, there quite clearly is.

There is evidence that cuts both for and against Plaintiff's ability to function in a work environment. But there is certainly sufficient evidence to—when considered in the aggregate— support the ALJ's decision that Plaintiff retained the ability to perform the basic mental demands of unskilled work: IQ testing showed Plaintiff's cognitive functioning fell in the average to low average range; Plaintiff demonstrated average to low average intellectual functioning during examinations; Plaintiff was attentive and could concentrate during examinations; Plaintiff adequately performed serial 3's, serial 7's, simple calculations, and digital span recall; Plaintiff could follow directions and commands and follow conversations; Plaintiff completed his own medical paperwork; Plaintiff generally showed appropriate social skills; Plaintiff could walk three miles with 30-50 pounds of groceries; and more. (Tr. 36-39, 113-14, 126-29, 323, 341, 414,

485, 490, 504, 507, 574, 584, 590, 632, 789,). The ALJ sufficiently explained why he discounted or rejected some opinions—or parts of opinions—and why he relied more heavily on others. In short, there is evidence in the record sufficient to support the ALJ's RFC finding that Plaintiff could function in an unskilled work position. (*See* **I. Background**).

### B. The ALJ Properly Evaluated Plaintiff's Credibility.

Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's subjective complaints and that the ALJ's credibility finding was unsupported by substantial evidence. An ALJ's credibility determination generally should not be reversed unless inherently incredible or patently unreasonable. *Atlantic Limousine, Inc. v. N.L.R.B.*, 243 F.3d 711, 718-19 (3d Cir. 2001) (citing *N.L.R.B. v. Lee Hotel Corp.*, 13 F.3d 1347, 1351 (9th Cir. 1994)). The Third Circuit requires that "[w]here medical evidence does support a claimant's complaints of pain, the complaints should then be given great weight and may not be disregarded unless there exists contrary medical evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993) (citing *Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir. 1987)) (internal quotations omitted). In assessing a claimant's credibility, the ALJ must provide a thorough discussion and analysis of the objective medical evidence and must resolve any inconsistencies. *Schaudeck v. Commissioner of Soc. Sec.*, 181 F.3d 429, 435 (3d Cir. 1999).

Here, the ALJ determined that Plaintiff's subjective complaints were not credible to the extent alleged. (Tr. 32-39; Def. Opp. at 20). The ALJ reasoned that Plaintiff's treatment record did not reflect work-preclusive limitations. (Tr. 32-39). Plaintiff filled out forms, followed commands, performed serial 3's, serial 7's, and digit span recall testing without significant deficits, interacted cooperatively with treating physicians, displayed appropriate social skills and

interactions, functioned on a daily basis,[3] and reported significant improvement in mood and anxiety on medication. (Tr. 36-39, 323, 341, 414, 485, 489, 490, 574, 584, 632, 789).

The ALJ provided a discussion and analysis of the objective medical and other evidence available in this case. He resolved the inconsistencies and determined that Plaintiff's alleged work-preclusive functional limitations were not reflected in the medical evidence and treatment record. This determination was not unreasonable. *Atlantic Limousine*, 243 F.3d at 718-19. The ALJ evaluated the purported severity of Plaintiff's complaints and, when compared to the medical record and Plaintiff's daily activities, arrived at the conclusion that the record did not reflect Plaintiff's claims of disabling limitations. (Tr. 32-39). Because of the thorough discussion and analysis—and reasonable outcome—this Court cannot reverse the ALJ's credibility determination.

### C. The Commissioner Sufficiently Demonstrated That There Is Work In The National Economy That Plaintiff Can Perform.

Plaintiff has no past work history. (Tr. 39; Pl. Br. at 21). Thus, the Commissioner must "demonstrate the claimant is capable of performing other available work in order to deny a claim of disability." *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999). Plaintiff argues that because the ALJ relied on a VE's response to a hypothetical question based on the ALJ's unsubstantiated RFC assessment, the VE's testimony cannot support the ALJ's finding that there is other work available in the national economy that Plaintiff can perform. (Pl. Br. 21-22). Plaintiff is incorrect.

---

[3] As previously discussed, Plaintiff walked three miles carrying 30-50 pounds of groceries, shopped in grocery stores and at the mall, used public transit, cooked multi-course meals, baked for himself, performed household chores, cared for his own personal needs, played video games and used the computer, sewed, gardened, watched television, and completed cosmetology school. (Tr. 63, 67-68, 70, 316-20, 334-40, 413).

As discussed above, the ALJ's decisions in this case stand on sufficient record support. An ALJ's hypothetical questions to a VE need only incorporate sufficiently supported limitations that the ALJ has deemed credible. *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005); *Jones v. Barnhart*, 364 F.3d 501, 506 (3d Cir. 2004). The ALJ presented such a hypothetical question to the VE here—it included Plaintiff's RFC limitations and vocational profile. The VE testified that there were numerous jobs in the national economy that Plaintiff could perform. (Tr. 79-89). A VE's testimony in response to such a hypothetical is "substantial evidence" for the purposes of satisfying the Commissioner's burden in proving that a Plaintiff can perform work that exists in substantial numbers in the national economy. *Plummer*, 186 F.3d at 431; 20 C.F.R. § 416.920. The VE's testimony thus provides adequate support for the ALJ's finding.

## IV.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.


Dated: _03/01/2017__                                    __s/Robert B. Kugler_
                                                        ROBERT B. KUGLER
                                                        United States District Judge